IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

YAHYI SHIHEED,                          *

      Plaintiff,                      *

v.                                      *        Civil Action No. GLR-20-421
                                                 Member Case: No. GLR-20-1040
HOLLY HOOVER, NP,                       *
f/n/a HOLLY PIERCE, NP, et al.,
                                        *
      Defendants.

                                      ***

## MEMORANDUM OPINION

THIS MATTER is before the Court on Motions to Dismiss or, in the Alternative,

Motions for Summary Judgment submitted by Defendants Holly Hoover, N.P., formerly

known as Holly Pierce, N.P., and Asresahegn Getachew, M.D.[1] (ECF Nos. 15, 18). The

Motions are ripe for review, and no hearing is needed. See Local Rule 105.6 (D.Md. 2018).

For the reasons outlined below, the Court will grant the Motions, which the Court construes

as motions for summary judgment.

## I.    BACKGROUND

### A.    Shiheed's Allegations

Plaintiff Yahyi Shiheed is an inmate housed at the North Branch Correctional

Institution in Cumberland, Maryland ("NBCI"). Shiheed brings this action against Holly

Hoover, a nurse practitioner, and Asresehegn Getachew, a physician, both of whom work

at NBCI under the employ of Corizon Health, Inc. ("Corizon"), and formerly under the

---

[1] The Clerk shall amend the docket to reflect Defendant Hoover's current name and
to reflect the full name of Defendant Getachew.

employ of Wexford Health Sources ("Wexford").[2] Shiheed alleges Defendants stopped his pain medication and refused to see him after he underwent an unsuccessful surgery to remove pins from his hands. (Compl. at 3–4,[3] ECF No. 1-2; see also Complaint at 3–4, Shiheed v. Pierce, N.P., No. GLR-20-1040 (filed Apr. 20, 2020) ["Shiheed II Compl."][4]). He also claims he needed additional surgery on his hand. (Id.). Shiheed further alleges that Hoover has treated him since 2017 and that she took him off his medications "for no legit[imate] reason." (Shiheed Decl. at 1, ECF No. 17-1).

**B.    Defendants' Response**

As an initial matter, Hoover asserts that Shiheed's medical records do not support his allegation that Getachew or Hoover evaluated him in 2017. (Hoover Decl. ¶ 6, ECF No. 15-3).

On January 28, 2018, Dr. Mahboob Ashraf saw Shiheed about renewing his medications. (Hoover Decl. ¶ 6; Y. Shiheed Medical Rs. ["Med. Rs."] at 13–14, ECF No. 15-4). Shiheed requested he be prescribed two 200 milligram Tegretol[5] tablets twice a day, but he already had active prescriptions for Tegretol until May 28, 2018, ibuprofen until

---

[2] Corizon replaced Wexford as the contracted health care provider at NBCI on January 1, 2019. (Hoover Decl. ¶ 19, ECF No. 15-3).

[3] Citations to page numbers in the Complaint refer to the pagination assigned by the Court's Case Management/Electronic Case Files ("CM/ECF") system.

[4] The Court consolidated Shiheed's second lawsuit against Defendants into this lawsuit. (See ECF No. 11).

[5] Tegretol is the brand name for carbamazepine, a drug used to treat nerve pain, among other things. See Tegretol Tablet, WebMD, https://www.webmd.com/drugs/2/drug-1502/tegretol-oral/details (last visited June 21, 2021).

April 6, 2018, and amitriptyline[6] until April 15, 2018. (Hoover Decl. ¶¶ 6, 7). Ashraf ordered Ensure nutritional supplement and a high-calorie diet due to Shiheed's low weight. (Id. ¶ 6).

Hoover's first encounter with Shiheed in 2018 was on April 13, 2018, when she examined him due to his complaints of headaches. (Hoover Decl. ¶ 8; Med. Rs. at 38–39). Shiheed reported a dull ache over his entire head, which was aggravated by head positioning and reading. (Med. Rs. at 38–39). He advised that he had not been wearing his glasses and Hoover instructed him to do so. (Id.). At the time of evaluation, Shiheed had active prescriptions for twenty milligram Prozac tablets at bedtime and two 200 milligram Tegretol tablets twice daily. (Id.).

On April 25, 2018, Hoover noted that Shiheed's lab work showed his Tegretol level was less than 0.1, a sub-therapeutic level. (Hoover Decl. ¶¶ 9, 15; Med. Rs. at 42). The low level indicated he was not taking his medication as prescribed and it was discontinued. (Hoover Decl. ¶ 9).

On May 7, 2018, Hoover evaluated Shiheed during a provider visit for chronic pain management. (Hoover Decl. ¶ 10; Med. Rs. at 43–44). Shiheed reported he had "bad hardware" in his right forearm that caused unbearable pain. (Med. Rs. at 43–44). He reported he was compliant with taking his pain medications and requested an increase of Tegretol. (Id.). Hoover noted that Shiheed was prescribed 400 milligrams of Tegretol twice

---

[6] Amitriptyline, also known by its brand name Elavil, is also used to treat nerve pain, among other things. See Moore et al., Amitriptyline for neuropathic pain in adults, Nat'l Ctr. Biotechnology Info. (July 6, 2015), available at ncbi.nlm.nih.gov/pmc/articles/PMC6447238/.

a day, but that his Tegretol level on April 19, 2018 was less than 0.1. (Id.). She also noted that Shiheed had a history of noncompliance. (Id.). Hoover offered Shiheed Tylenol and ibuprofen, but he refused the medication and advised Hoover that she would "hear from [his] lawyer." (Id.). Hoover ordered x-rays of Shiheed's hand. (Id.).

Dr. Suthir Kathuria, a radiologist, conducted an x-ray of Shiheed's hand the following day. (Hoover Decl. ¶ 11; Med. Rs. at 4). Kathuria identified intact metallic hardware along the second metacarpal bone with no evidence of acute fracture, dislocation, or subluxation. (Med. Rs. at 4). Kathuria described the phalanges and carpal bones as intact and the alignment anatomical. (Id.). Kathuria identified no acute osseous abnormalities. (Id.).

Stacie Mast, R.N., evaluated Shiheed on May 16, 2018, after he requested pain medications. (Hoover Decl. ¶ 12; Med. Rs. at 46–47). Shiheed requested renewal of baclofen, a muscle relaxant, for his back pain. (Med. Rs. at 46–47). During examination, Shiheed offered no active complaints and was able to move his upper and lower extremities without difficulty, get on and off the exam table without difficulty, and twist his body to watch people walk by. (Id.). Mast reminded Shiheed that he had refused the recommended pain medication offered at the provider visit and recommended he purchase Motrin and Tylenol from the commissary to treat any discomfort. (Id.). He did not complain of hand pain during this visit. (Id.).

Shiheed was seen by Lauren Beitzel, L.C.P.C., on May 17, 2019. (Id. at 48–49). He requested amitriptyline, Tegretol, and baclofen. (Id.). Beitzel reminded Shiheed that his pain medication was discontinued because his lab work indicated he had not been taking

it. (Id.). Beitzel also reminded him that he needed to take medication as prescribed and advised him to speak to the medical department about renewing his prescriptions. (Id.).

Shiheed refused to appear for a nurse sick call on May 20, 2018. (Id. at 50). Beitzel saw him the following day. (Id. at 52). He reported pain in his right hand and requested pain medication. (Id.). Beitzel advised him that the medical department must issue pain medication and was instructed to speak to them about his condition. (Id.). Beitzel further advised him that inmates throughout the institution were being weaned from pain medication and he was not being singled out. (Id.).

Mast evaluated Shiheed again on May 23, 2018, due to his request to be referred to pain management. (Hoover Decl. ¶ 13; Med. Rs. at 54–55). Shiheed reported that his hand hurt from implanted hardware from a past injury. (Med. Rs. at 54–55). Mast noted that Shiheed walked into medical without difficulty and did not have active complaints of pain. (Id.). She advised him to use warm compresses and take Motrin as needed. (Id.). Shiheed stated that he needed something strong like Ultram[7] or baclofen. (Id.). Mast noted that his injury was from 2007 and he was able to open and close his hand as needed. (Id.).

Shiheed refused to be seen at nurse sick call on May 31, 2018. (Id. at 56). On June 3, 2018, when being evaluated by a behavioral health nurse regarding his complaints that

---

[7] Ultram, the brand name for the generic tramadol, is an opioid analgesic used to treat moderate to severe pain. See Ultram, WebMD, https://www.webmd.com/drugs/2/drug-11276/ultram-oral/details (last visited June 21, 2021). Hoover explains that Ultram has a high risk for addiction, dependence, and abuse; is rarely prescribed in prisons; is not prescribed for long-term chronic pain because of the risk of dependence and diversion; and is typically reserved for short-term acute, severe injuries. (Hoover Decl. ¶ 14).

he needed medication for stress and pain, Shiheed yelled at her, called her names, and told her to go away. (Id. at 57).

During nurse sick call on June 12, 2018, Shiheed requested baclofen for pain relief. (Id. at 58–59). He was advised that baclofen was not indicated for chronic pain and referred to a provider for medication review. (Id.). Beitzel evaluated Shiheed six days later, and Shiheed again requested Tegretol, baclofen, and amitriptyline. (Hoover Decl. ¶ 15; Med. Rs. at 61–62). Beitzel again reminded Shiheed that his lab results indicated he was noncompliant with taking his medication. (Med. Rs. at 61–62). Shiheed blamed medical staff. (Id.). Beitzel informed Shiheed that it would be unethical to prescribe him medications that he was abusing and that, in any event, a psychiatrist could not prescribe the mediation. (Id.). Beitzel suggested he resolve the issue with the medical department. (Id.). Beitzel confirmed, however, that Shiheed was indigent and therefore unable to obtain over-the-counter medications from the commissary. (Id.).

Kristi Cortez, R.N., saw Shiheed at nurse sick call on July 26, 2018. (Id. at 65–66). Shiheed complained of pain in both hands and again asked for baclofen, amitriptyline, and Tegretol for hand pain, which he described as "pins and needles." (Id.). Cortez referred him to a provider for further evaluation and treatment. (Id.).

On August 7, 2018, Hoover prescribed Shiheed an antibiotic and Tylenol for a boil in his right armpit. (Id. at 67–68). Hoover advised him to apply warm damp compresses. (Id.). Four days later, Shiheed was seen by medical staff following a use-of-force incident. (Id. at 71). He stated that he had no injuries and no cuts or abrasions were observed. (Id.). Shiheed refused to attend nurse sick call on August 21, 2018. (Id. at 72).

Getachew, the Regional Medical Director, evaluated Shiheed via telemedicine on August 27, 2018, for a provider chronic care and sick call visit. (Hoover Decl. ¶ 16; Med. Rs. at 74–75). Getachew noted that Shiheed was thirty-three years old with a history of chronic pain in his right hand relating to hardware placed in the hand due to a fracture he had suffered many years earlier. (Med. Rs. at 74–75). Since then, Shiheed complained of severe pain that interfered with his sleep and activities of daily living. (Id.). Shiheed stated the pain was well-controlled by amitriptyline, but the prescription was discontinued when it expired. (Id.). Getachew reviewed Shiheed's medical records and determined that given Shiheed's reported relief when using amitriptyline, if there was no contraindication associated with his use of the drug, he would prescribe it and reevaluate in ninety days. (Id.). Getachew's examination of Shiheed's right hand revealed no joint deformity, heat, swelling, erythema, or effusion, and found that the hand had full range of motion. (Id.). Getachew assessed Shiheed as suffering from chronic pain due to the old injury and the metallic hardware placed along the second metacarpal bone. (Id.). He prescribed fifty milligrams of amitriptyline nightly and directed that Shiheed be reevaluated in ninety days. (Id.).

Robin Shively, R.N., saw Shiheed at nurse sick call on August 31, 2018. (Id. at 76). Shiheed complained that he did not receive the amitriptyline and Tegretol prescribed by Getachew. (Id.). Shively advised him that Getachew only prescribed fifty milligrams of amitriptyline nightly and the order had been placed. (Id.).

On September 27, 2018, Jeremiah Munday, R.N., saw Shiheed after a use-of-force incident where Shiheed was sprayed with pepper spray. (Id. at 85). Shiheed refused a medical examination and denied any other complaints. (Id.).

On October 23, 2018, Mike Klepitch, R.N., evaluated Shiheed for complaints of hand pain. (Hoover Decl. ¶ 17; Med. Rs. at 92–93). Shiheed requested muscle rub and Tylenol and Hoover entered orders for same. (Med. Rs. at 92–93).

Shively saw Shiheed at nurse sick call on October 31, 2018, after an altercation between Shiheed and custody staff. (Id. at 98). He had a cut on his chest which was cleaned and covered with a band-aid. (Id.). Shiheed later refused his annual physical exam with Hoover on December 12, 2018. (Id. at 115).

Dawn Hawk, R.N., saw Shiheed on December 29, 2018, due to complaints regarding his medication. (Hoover Decl. ¶ 18; Med. Rs. at 123–24). Hawk noted that Shiheed's prescription for amitriptyline expired on November 30, 2018, and he complained of hand pain and numbness. (Med. Rs. at 123–24). Hawk's examination revealed no tenderness, pain with movement, spasms, weakness, discoloration, warmth, tingling, or swelling. (Id.). The range of motion in Shiheed's hand was normal, but Hawk observed some numbness. (Id.). Hawk referred Shiheed to a provider. (Id.).

Klepitch evaluated Shiheed on January 25, 2019, for complaints of pain. (Hoover Decl. ¶ 20; Med. Rs. at 132–33). Shiheed did not appear in distress and was yelling to friends and joking with officers. (Med. Rs. at 132–33). He reported that he had pins in his hand that caused him pain and that he wanted to be placed on Tegretol and amitriptyline.

(Id.). Klepitch noted that Shiheed's amitriptyline prescription expired on November 30, 2018, and his Tegretol prescription expired on May 7, 2018. (Id.)

Hoover evaluated Shiheed on April 10, 2019, for chronic pain. (Hoover Decl. ¶ 21; Med. Rs. at 146–47). Shiheed stated that he had bad hardware in his right forearm causing him unbearable pain. (Med. Rs. at 146–47). Hoover examined Shiheed and found he had normal musculature and no skeletal tenderness or joint deformity. (Id.). Hoover assessed Shiheed as suffering from chronic pain and prescribed Tylenol and ibuprofen for discomfort, ordered x-rays of the right hand, and directed Shiheed to return for a follow-up visit after the x-rays were taken. (Id.).

Dr. Labib Syed, a radiologist, took x-rays of Shiheed's right hand on April 15, 2019. (Hoover Decl. ¶ 22; Med. Rs. at 3). Syed saw no evidence of acute fracture, dislocation, or subluxation. (Med. Rs. at 3). Syed noted that the alignment was anatomic and observed no acute osseous abnormalities. (Id.). Hoover noted that Shiheed did not have any hardware in his forearm, but rather, only in his second right metacarpal. (Hoover Decl. ¶ 22).

Hoover again evaluated Shiheed on May 2, 2019, for complaints of pain in his right hand. (Id. ¶ 23; Med. Rs. at 155–56). Shiheed again reported that he had bad hardware in his right forearm that caused him unbearable pain and which was sticking out of his thumb. (Med. Rs. at 155–56). Hoover reviewed the x-rays, noting the hardware in the right hand. (Hoover Decl. ¶ 24). Shiheed reported having an open reduction internal fixation ("ORIF") in 2006. (Med. Rs. at 155–56). Hoover explains that during an ORIF, the surgeon makes an incision and the patient's bones are set with screws, rods, or plates. (Hoover Decl. ¶ 24). The type of hardware used depends on the location of the fracture and the hardware is often

left in the bone permanently. (Id.). Shiheed stated he thought he had a rod in his right forearm. (Med. Rs. at 155–56). Hoover continued the current pain management regimen and submitted a consultation request for Shiheed to see an orthopedist. (Id. at 153–54). Contrary to his reports, Shiheed did not have a rod in his forearm. (Hoover Decl. ¶ 23).

Dennis Martin, R.N., evaluated Shiheed on May 22, 2019, for right hand discomfort. (Id. ¶ 25; Med. Rs. at 168–69). Shiheed was able to make a fist and had good pulses and capillary refill. (Med. Rs. at 168–69). Shiheed reported sharp pain, but Martin noted that Shiheed already had orders for ibuprofen and Tylenol. (Id.). Martin also noted that recent x-rays showed no acute osseous abnormality. (Id.). Martin encouraged Shiheed to continue light range of motion and stretching exercises and to take medications as ordered. (Id.).

Mast saw Shiheed on June 17, 2019, for complaints that he wanted to see a doctor regarding pain management. (Hoover Decl. ¶ 26, Med. Rs. at 234–35). Shiheed stated he was in severe pain and had not been seen for ninety days. (Med. Rs. at 234–35). He stated that the pin in his hand was coming out, but Mast did not observe any extruding pins. (Id.). Mast referred him to a provider for an update regarding scheduling a visit with a hand specialist. (Id.).

Hoover again evaluated Shiheed on August 29, 2019, for a provider visit for chronic pain management. (Hoover Decl. ¶ 27; Med. Rs. at 184–85). Shiheed again reported he had bad hardware in his right forearm that caused unbearable pain and numbness. (Med. Rs. at 184–85). He also stated that hardware was sticking out of his thumb. (Id.). Hoover noted that Shiheed had an appointment scheduled with an orthopedist for this issue. (Id.). Shiheed also reported that he suffered from headaches. (Id.). Hoover provided Shiheed with

information regarding rebound headaches associated with overuse of medications. (Id.). Upon examination, Shiheed's right hand had tenderness but no swelling. (Id.). Hoover prescribed him ibuprofen and amitriptyline for the hand pain and Excedrin Migraine for headaches. (Id.). Hoover also ordered laboratory tests. (Id.).

Hoover next saw Shiheed on November 5, 2019. (Hoover Decl. ¶ 28; Med. Rs. at 194). Hoover evaluated Shiheed through his cell door because he refused to go to the medical unit. (Med. Rs. at 194). Shiheed complained that wires were sticking through his hand and no one was doing anything about it. (Id.). He held his hand up to the window for inspection and Hoover saw that the skin was intact, with no redness, swelling, or deformity, and observed no wires sticking through his hand. (Id.). Hoover ordered additional x-rays of Shiheed's hand. (Id.).

Kathuria conducted x-rays of Shiheed's right hand on November 8, 2019. (Hoover Decl. ¶ 29; Med. Rs. at 2). Kathuria identified hardware along the second right metacarpal. (Med. Rs. at 2). He did not see evidence of acute fracture, dislocation, or subluxation. (Id.). The alignment was anatomic and there were no acute osseous abnormalities. (Id.).

Dr. Ashok Krishnaswamy evaluated Shiheed on November 13, 2019 via telemedicine. (Hoover Decl. ¶ 30; Med. Rs. at 197). Krishnaswamy recommended a consultation for removal of the pin from Shiheed's right hand. (Med. Rs. at 197). Sue Brant, R.N., forwarded Krishnaswamy's recommendation to Getachew for review. (Id.). Hoover next evaluated Shiheed on December 24, 2019. (Hoover Decl. ¶ 31; Med. Rs. at 379–80). She noted Krishnaswamy's recommendation to remove the plate and screws from Shiheed's hand and submitted a consultation request for the surgery. (Med. Rs. at 377–78).

On January 10, 2020, Dr. Cedric Poku-Dankwah evaluated Shiheed for a preoperative provider visit. (Hoover Decl. ¶ 32; Med. Rs. at 382–83). Poku-Dankwah noted Shiheed had complained of pain and protruding hardware and also noted tenderness over the protruding hardware in the second right metacarpal. (Med. Rs. at 382–83). While Poku-Dankwah noted the protruding hardware, neither Krishnaswamy nor any of the care providers at the facility noted any such protrusions. (Hoover Decl. ¶ 32).

On January 16, 2020, Krishnaswamy saw Shiheed at Grace Medical Center for hand surgery. (Hoover Decl. ¶ 33; Med. Rs. at 420–37). X-rays of the hand showed the prior ORIF with no acute fracture of dislocation, and the remaining osseous structures and soft tissues were unremarkable. (Med. Rs. at 432). The x-ray also showed a healed fracture at the right second metacarpal with a compression plate and screws in place and heterotopic bone formation. (Id.). Krishnaswamy noted Shiheed complained of pain in his right hand over the second metacarpal. (Id. at 429). Krishnaswamy explained to Shiheed that he was going to try to remove the plate and screws and the extra bone formation. (Id.). He explained the procedure and the potential risks, including the need to remove the plate in the future if it could not be removed that day. (Id.). Shiheed accepted the risks. (Id.).

Krishnaswamy noted that during the procedure, he removed a fair amount of bone that had formed around the screws to expose the plate and screws, but then discovered that the screwdriver set did not fit the screws. (Id.). He tried several times to remove the screws but could not. (Id.). Krishnaswamy decided to procure additional instruments in the future and try again. (Id.). He diagnosed Shiheed as having a post-healed fracture, right second metacarpal bone with heterotopic bone formation. (Id. at 428). Krishnaswamy planned to

reschedule Shiheed for removal of the plate and screws once the necessary equipment became available. (Id. at 426).

Upon discharge from the hospital, Shiheed was transferred to Jessup Regional Infirmary, where Robert Giangrandi, P.A., evaluated him. (Id. at 385–86). Giangrandi noted that Krishnaswamy intended to reschedule Shiheed for removal of the plate and screws once special equipment became available. (Id.). He also noted Shiheed was cleared to return to his housing unit. (Id.).

Thereafter, Shiheed was regularly seen for wound care until February 22, 2020, when Klepitch noted that the wound was completely healed and no further wound care was necessary. (Hoover Decl. ¶ 35; Med. Rs. at 400). Klepitch again evaluated Shiheed on February 24, 2020, due to complaints of hand pain. (Med. Rs. at 401–02). Klepitch noted that officers had used force on Shiheed and Shiheed now complained of pain in the area of his hand surgery. (Id.). Examination showed swelling and decreased range of motion. (Id.). Klepitch reviewed his findings with Hoover, who ordered x-rays and a provider visit. (Id.).

Kathuria took x-rays of Shiheed's right hand on March 3, 2020. (Hoover Decl. ¶ 36; Med. Rs. at 440). Kathuria found no evidence of fracture, dislocation, or subluxation. (Med. Rs. at 440). The post-surgical hardware remained in place along the second metacarpal bone. (Id.). Kathuria noted that the phalanges and carpal bones were intact and alignment was anatomical, and detected no acute osseous abnormalities. (Id.).

Hoover evaluated Shiheed on March 17, 2020, during a provider visit. (Hoover Decl. ¶ 37; Med. Rs. at 413–14). Hoover noted that Shiheed had undergone exploratory surgery and the surgeon recommended removal of the plate and screws when special

equipment became available. (Med. Rs. at 413–14). Hoover continued Shiheed on ibuprofen for discomfort. (Id.). Hoover's examination revealed that Shiheed had right hand tenderness at the surgical site. (Id.). Hoover submitted a consultation request for him to return to the orthopedic surgeon. (Id. at 411–12). Hoover renewed Shiheed's medications on April 9, 2020. (Hoover Decl. ¶ 38; Med. Rs. at 417).

On May 6, 2020, Shiheed submitted a sick call slip regarding hand pain, and Hoover updated his chart to note that the surgery was pending and Shiheed was to continue ibuprofen for discomfort. (Hoover Decl. ¶ 39; Med. Rs. at 410). She also renewed his Excedrin Migraine and noted that a high-calorie diet was not indicated. (Med. Rs. at 410). On May 29, 2020, in response to Shiheed's sick call slips requesting Excedrin Migraine, a high-calorie diet and stronger pain relief medication, Hoover renewed the Excedrin Migraine but again found that a high-calorie diet was not indicated. (Id. at 509–10). She further noted that Shiheed was scheduled for removal of the plate and screws in his hand, and counseled him to continue taking ibuprofen and amitriptyline as prescribed for pain relief. (Id.).

The hardware was removed from Shiheed's hand on July 28, 2020, at Grace Memorial Hospital. (Hoover Decl. ¶ 41; Med. Rs. at 519–20). Shiheed was returned the same day to the WCI infirmary where he denied having any pain. (Med. Rs. at 519–20). Getachew directed Shiheed be placed in the infirmary for observation. (Hoover Decl. ¶ 41). Shiheed was scheduled for a follow-up appointment with the orthopedist. (Id.).

### C.  **Procedural Background**

The Court received Shiheed's Complaint in this action on February 18, 2020. (ECF Nos. 1, 1-2). Shiheed filed a second lawsuit against the same Defendants on April 20, 2020, which included additional factual allegations but at its core concerned the same events and the same Defendants. (See Shiheed II Compl. at 3–4). On September 1, 2020, the Court consolidated Shiheed's second lawsuit into this action. (See ECF No. 11).

In his Complaints, Shiheed alleges that Defendants violated the Eighth Amendment by exhibiting deliberate indifference toward his serious medical need, specifically by wrongly denying him pain medication and otherwise failing to adequately address the pain in his right hand. (Compl. at 3–4; Shiheed II Compl. at 4–5). He seeks compensatory and punitive damages. (Compl. at 4; Shiheed II Compl. at 5).

On September 18, 2020, Defendants filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, regarding the portion of Shiheed's allegations arising during their employment with Corizon. (ECF No. 15). On October 29, 2020, Defendants filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, regarding the portion of Shiheed's allegations arising during their employment with Wexford. (ECF No. 18). The Court received Shiheed's Opposition to Defendants' first Motion on October 27, 2020. (ECF No. 17). Shiheed filed a Notice with the Court on November 10, 2020, in which he appeared to indicate his intention for his initial response to be deemed responsive to Defendants' second Motion. (ECF No. 20). Defendants filed a Reply that same day. (ECF No. 21).

## II.     DISCUSSION

### A.     <u>Motion to Appoint Counsel</u>

Shiheed filed a Motion to Appoint Counsel on December 9, 2020. (ECF No. 22). Under 28 U.S.C. § 1915(e)(1), a federal court may request an attorney to represent any person unable to afford counsel. A federal district court judge's power to appoint counsel under § 1915(e)(1) is a discretionary one and may be considered where an indigent claimant presents exceptional circumstances. <u>See</u> <u>Cook v. Bounds</u>, 518 F.2d 779 (4th Cir. 1975); <u>see also</u> <u>Branch v. Cole</u>, 686 F.2d 264 (5th Cir. 1982). There is no absolute right to appointment of counsel; an indigent claimant must present "exceptional circumstances." <u>See</u> <u>Miller v. Simmons</u>, 814 F.2d 962, 966 (4th Cir. 1987). Exceptional circumstances exist where a "pro se litigant has a colorable claim but lacks the capacity to present it." <u>See</u> <u>Whisenant v. Yuam</u>, 739 F.2d 160, 163 (4th Cir. 1984), <u>abrogated on other grounds by</u> <u>Mallard v. U.S. Dist. Ct.</u>, 490 U.S. 296, 298 (1989) (holding that 28 U.S.C. § 1915 does not authorize compulsory appointment of counsel).

Upon careful consideration of the motions and previous filings by Shiheed, the Court finds that he has demonstrated the wherewithal to either articulate the legal and factual basis of his claims himself or secure meaningful assistance in doing so. The issues pending before the Court are not unduly complicated. Therefore, there are no exceptional circumstances that would warrant the appointment of an attorney to represent Shiheed under § 1915(e)(1). His Motion to Appoint Counsel will be denied.

**B.     Standard of Review**

**1.     Conversion**

Defendants style their Motions as motions to dismiss under Rule 12(b)(6) or, in the alternative, for summary judgment under Rule 56. "A motion styled in this manner implicates the Court's discretion under Rule 12(d)[.]" Pevia v. Hogan, 443 F.Supp.3d 612, 625 (D.Md. 2020) (citation omitted). Rule 12(d) provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). The Court has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." Wells-Bey v. Kopp, No. ELH-12-2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013) (quoting 5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004)).

The United States Court of Appeals for the Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice and "a reasonable opportunity for discovery." Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt., 721 F.3d 264, 281 (4th Cir. 2013) (citation omitted). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur. See Moret v. Harvey, 381 F.Supp.2d 458, 464 (D.Md. 2005) (citing Laughlin v. Metro. Wash. Airports Auth.,

149 F.3d 253, 260–61 (4th Cir. 1998)). The Court "does not have an obligation to notify parties of the obvious." <u>Laughlin</u>, 149 F.3d at 261.

Ordinarily, summary judgment is inappropriate when "the parties have not had an opportunity for reasonable discovery." <u>E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.</u>, 637 F.3d 435, 448 (4th Cir. 2011) (citation omitted). Yet "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" <u>Harrods Ltd. v. Sixty Internet Domain Names</u>, 302 F.3d 214, 244 (4th Cir. 2002) (quoting <u>Evans v. Techs. Applications & Serv. Co.</u>, 80 F.3d 954, 961 (4th Cir. 1996)). To successfully raise the need for additional discovery, the non-movant must typically file an affidavit or declaration under Rule 56(d), explaining the "specified reasons" why "it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d). A Rule 56(d) affidavit is inadequate if it simply demands "discovery for the sake of discovery." <u>Hamilton v. Mayor & City Council of Balt.</u>, 807 F.Supp.2d 331, 342 (D.Md. 2011) (citation omitted). A Rule 56(d) request for discovery is properly denied when "the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." <u>Ingle ex rel. Estate of Ingle v. Yelton</u>, 439 F.3d 191, 195 (4th Cir. 2006) (quoting <u>Strag v. Bd. of Trs., Craven Cmty. Coll.</u>, 55 F.3d 943, 954 (4th Cir. 1995)).

The Fourth Circuit has warned that it "'place[s] great weight on the Rule 56[d] affidavit' and that 'a reference to Rule 56[d] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate

substitute for a Rule 56[d] affidavit.'" <u>Harrods</u>, 302 F.3d at 244 (quoting <u>Evans</u>, 80 F.3d at 961). Failing to file a Rule 56(d) affidavit "is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." <u>Id.</u> (quoting <u>Evans</u>, 80 F.3d at 961). Despite these holdings, the Fourth Circuit has indicated that there are some limited circumstances in which summary judgment may be premature, notwithstanding the non-movants' failure to file a Rule 56(d) affidavit. <u>See</u> <u>Id.</u> A court may excuse the failure to file a Rule 56(d) affidavit when "fact-intensive issues, such as intent, are involved" and the nonmovant's objections to deciding summary judgment without discovery "serve[ ] as the functional equivalent of an affidavit." <u>Id.</u> at 244–45 (quoting <u>First Chi. Int'l v. United Exch. Co.</u>, 836 F.2d 1375, 1380 (D.C.Cir. 1988)).

Here, the Court concludes that both requirements for conversion are satisfied. Shiheed was on notice that the Court might resolve Defendants' Motions under Rule 56 because Defendants styled their Motions in the alternative for summary judgment and presented extra-pleading material for the Court's consideration. <u>See</u> <u>Moret</u>, 381 F.Supp.2d at 464. In addition, the Clerk informed Shiheed about the Motions and the need to file an opposition. (<u>See</u> Rule 12/56 Letters, ECF Nos. 16, 19). Shiheed filed an Opposition but did not include a request for more time to conduct discovery. (<u>See</u> ECF No. 17). Because the Court will consider documents outside of Shiheed's Complaint in resolving Defendants' Motions, the Court will treat the Motions as ones for summary judgment.

### 2.    Summary Judgment

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor.

Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing that there is a genuine dispute of material fact. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 140 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co., LLC v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citations omitted). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the

outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001). A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of his case where he has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

## C.    **Analysis**

Shiheed alleges that Defendants violated the Eighth Amendment of the United States Constitution by denying him adequate medical care, including pain medication, for the injury to his right hand. The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. Gregg v. Georgia, 428 U.S. 153, 173 (1976) (citation omitted); see also Hope v. Pelzer, 536 U.S. 730, 737 (2002) (citation omitted); Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016) (citation omitted); King v. Rubenstein, 825 F.3d 206, 218 (4th Cir. 2016) (citation omitted). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." De'Lonta v. Angelone, 330 F.3d 630, 633 (4th Cir. 2003) (citing Wilson v. Seiter, 501 U.S. 294, 297 (1991)); accord Anderson v. Kingsley, 877 F.3d 539, 543 (4th Cir. 2017).

To prevail on an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. See Estelle v. Gamble, 429 U.S. 97, 106 (1976); see also Anderson, 877 F.3d at 543. A prisoner plaintiff must allege and provide some evidence he was suffering from a serious medical need and that defendants were aware of his need for medical attention but failed to either provide it or ensure it was available. See Farmer v. Brennan, 511 U.S. 825, 834–37 (1994); see also Heyer v. U.S. Bureau of Prisons, 849 F.3d 202, 209–10 (4th Cir. 2017); King, 825 F.3d at 218; Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. See Hudson v. McMillian, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); accord Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014).

After a serious medical need is established, a successful Eighth Amendment claim requires proof that the defendant was subjectively reckless in treating or failing to treat the serious medical condition. See Farmer, 511 U.S. at 839–40; see also Rich v. Bruce, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). Indeed, "[a]ctual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" Brice v. Va. Beach Corr. Ctr., 58 F.3d 101, 105 (4th Cir. 1995) (quoting Farmer, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through other

evidence that tends to establish the defendant knew about the problem. <u>Scinto</u>, 841 F.3d at 226. This includes evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." <u>Id.</u> (quoting <u>Farmer</u>, 511 U.S. at 842).

Mere negligence or malpractice does not rise to a constitutional level. <u>Donlan v. Smith</u>, 662 F.Supp. 352, 361 (D. Md. 1986) (citing <u>Estelle</u>, 429 at 106); <u>see also</u> <u>Scinto</u>, 841 F.3d at 225. "Deliberate indifference is 'more than mere negligence,' but 'less than acts or omissions [done] for the very purpose of causing harm or with knowledge that harm will result.'" (quoting <u>Farmer</u>, 511 U.S. at 835) (alteration in original); <u>Russell v. Sheffer</u>, 528 F.2d 318, 318–19 (4th Cir. 1975) (citing <u>Gittlemacker v. Prasse</u>, 428 F.2d 1, 6 (3rd Cir. 1970)) ("[M]istreatment or non-treatment must be capable of characterization as 'cruel and unusual punishment' in order to present a colorable claim[.]")

Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. <u>See</u> <u>Lightsey</u>, 775 F.3d at 179 (physician's act of prescribing treatment raises a fair inference that he believed treatment was necessary and that failure to provide it would pose an excessive risk). "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." <u>Wright v. Collins</u>, 766 F.2d 841, 849 (4th Cir. 1985). Additionally, the right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." <u>United States v. Clawson</u>, 650 F.3d 530, 538 (4th Cir. 2011) (quoting <u>Bowring v. Godwin</u>, 551 F.2d 44, 47–48 (4th Cir. 1977)).

Here, the Court has seen no evidence supporting Shiheed's allegation that Defendants were deliberately indifferent to his medical needs. The record in this case reveals that Shiheed's prescription for Tegretol was discontinued because his blood work revealed that he was not taking the medication as prescribed. After the Tegretol prescription was discontinued, Shiheed declined prescriptions for Tylenol and ibuprofen. Thereafter, he repeatedly sought prescriptions for pain medications—and sought other medications not indicated for chronic pain—resulting in notations throughout his medical file that he was engaged in drug-seeking behavior. Shiheed was ultimately prescribed a variety of analgesic medication to treat his reports of pain. Medical staff evaluated Shiheed's claims and directed a conservative course of treatment with pain management, gentle stretching and exercises, and warm compresses. Hoover also ordered diagnostic testing, including a series of x-rays, which showed the hardware in his hand intact. Neither Hoover nor Getachew observed that Shiheed's hardware was misaligned or protruding from his hand. Ultimately, he was referred to a specialist who recommended removal of the hardware, which was done over the course of two surgical procedures.

The Court can find no evidence in the record indicating that Defendants' decisions here were the result of deliberate indifference. Instead, the record evidence is unambiguous that Defendants' decisions flow from awareness of Shiheed's noncompliance with medication regimens and their observations and examinations of his hand. Moreover, "[t]he decision to stop providing [Shiheed] with the medication was in fact the opposite of deliberate indifference; to continue providing narcotic strength pain relievers when it becomes apparent that they are being misused or abused is to disregard [a prisoner's] health

24

and well-being." <u>Robinson v. Mace</u>, No. DKC-20-1143, 2021 WL 1610150, at *6 (D.Md. Apr. 26, 2021). Absent extraordinary circumstances—which are not evident in the record—Shiheed's disagreement with Defendants regarding the appropriateness of their treatment protocol cannot support a deliberate indifference claim. <u>See</u> <u>Estelle</u>, 429 U.S. 105–06 (holding that disagreements between medical staff and an inmate over the necessity for or extent of medical treatment do not rise to a constitutional injury). Additionally, "evidence of unsuccessful medical treatment, such as the inability to reduce pain, is insufficient to establish deliberate indifference." <u>Robinson v. Unknown Name Pers. in Charge, Corizon Health Care</u>, No. DKC-19-2997, 2021 WL 82909, at *14 (D.Md. Jan. 11, 2021). For these reasons, Defendants are entitled to judgment in their favor.

## III. CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF Nos. 15, 18) will be granted. Shiheed's Motion to Appoint Counsel (ECF No. 22) will be denied. A separate Order follows.

Entered this 25th day of June, 2021.


_____/s/_____
George L. Russell, III
United States District Judge